**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | |
|---|---|
| TERRELL PRICE, | Case No. 1:19-cv-740 |
| Plaintiff, | Cole, J. |
| | Bowman, M.J. |
| v. | |
| OHIO DEPT. OF REHABILITATION AND CORRECTIONS, et. al., | |
| Defendants. | |

**REPORT AND RECOMMENDATION**

Plaintiff, presently incarcerated at the Warren Correctional Institution, filed this civil rights action against multiple defendants concerning conditions of his incarceration at the Lebanon Correctional Institution ("LeCI"). Upon initial review in the Eastern Division of this Court, claims against the Ohio Department of Rehabilitation and Corrections ("ODRC") were dismissed under the Eleventh Amendment. The case was then transferred to the Western Division and reassigned to the undersigned magistrate judge for initial review. (Docs. 2, 4, 5). After additional screening, additional claims and defendants were dismissed, but a single claim against four Defendants in their individual capacities was permitted to proceed. (Docs. 7, 11). In that claim, Plaintiff alleges that Defendants failed to protect him from an attack by his cellmate.

Through counsel, Defendants Unit Manager Snively, Case Manager Ford, Sergeant Dupuis,[1] and Correctional Officer Cooper have now moved for summary judgment. Plaintiff has filed a response in opposition, to which Defendants have filed a

---

[1] The record reflects that Plaintiff's complaint misspelled this Defendant's surname as "Dubuis." The motion for summary judgment and Defendant's affidavit reflect the correct spelling as "Dupuis."

1

reply.² For the following reasons, Defendants' motion should be GRANTED.

## I. Summary Judgment Standard of Review

In a motion for summary judgment, "a court must view the facts and any inferences that can be drawn from those facts . . . in the light most favorable to the non-moving party." *Keweenaw Bay Indian Comm. v. Rising*, 477 F.3d 881, 886 (6th Cir. 2007) (internal quotation marks omitted). "Summary judgment is only appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(e)) (internal quotation marks omitted). "Weighing of the evidence or making credibility determinations are prohibited at summary judgment—rather, all facts must be viewed in the light most favorable to the non-moving party." *Id.*

After a moving party has carried its initial burden of showing that no genuine issues of material fact remain in dispute, the burden shifts to the non-moving party to present specific facts demonstrating a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S.Ct. 1348 (1986). "The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (citing *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)). In order to survive summary judgment, the non-moving party must present probative evidence that supports its complaint. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50, 106 S.Ct. 2505

---

²On December 2, 2020, Plaintiff filed a "Response to Defendant['] Reply," docketed as a "supplemental memorandum" in opposition to summary judgment. (Doc. 26). As Defendants point out, the supplemental memorandum constitutes a surreply, which is not authorized by the civil rules and may not be considered without leave of court. (Doc. 27). The undersigned nevertheless has reviewed the supplemental memorandum, but finds no new material or argument that would alter the conclusion that summary judgment should be granted.

(1986). The non-moving party's evidence "is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. The court determines whether the evidence requires submission to a jury, or whether one party must prevail as a matter of law because the issue is so one-sided. *Id.* at 251-52.

Although reasonable inferences must be drawn in favor of the opposing party, *see id.* at 255, he must present significant probative evidence tending to support the complaint. *First Nat'l Bank of Ariz. v. Cities Servs. Co.*, 391 U.S. 253, 290, 88 S.Ct. 1575 (1968). To demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

**II.    Findings of Fact**

The following facts are largely undisputed. In accordance with Rule 56 standards, where discrepancies exist, the facts have been construed in Plaintiff's favor except for instances in which unrebutted record evidence flatly contradicts Plaintiff's allegations.

In 2014, Plaintiff was convicted of drug trafficking and related offenses, and sentenced to a term of fourteen years imprisonment. (Doc. 17-5 at 6; Doc. 17-6 at 3). In June 2018, Plaintiff was moved within LeCI to a new cell occupied by Joshua Morrissette who allegedly told him "how things were going to be or be assaulted." (Doc. 3, Complaint at PageID 45). Just before that cell move, Plaintiff had been approved for a visitation transfer to Mansfield Correctional Institution to be closer to his family. (Doc. 17-12, Dupuis Aff at ¶ 8; Doc. 17-13, Snively Aff. at ¶ 8; Doc. 17-11, Schweitzer Aff. at ¶8).

On the evening of June 8, 2018, non-party correctional officers Bratcher and Flowers discovered a small amount of marijuana and suboxone strips in Plaintiff's cell, under Plaintiff's mattress. (*Id.*, Dupuis Aff. at ¶8, Snively Aff. at ¶8, Schweitzer Aff. at ¶7). Upon questioning, Plaintiff admitted to ownership of the contraband. (*Id.*) C/O Bratcher drafted a Conduct Report charging Plaintiff with a Rule 39 violation (unauthorized possession of drugs) based upon Plaintiff's verbal admission. (Doc. 17-1). Plaintiff alleges in his complaint that after he was taken "out of sight" of Morrissette, he informed the correctional officer (presumably Bratcher) that he was "forced" to admit to the contraband by his cellmate. (Doc. 3 at PageID 46.). However, the Conduct Report makes no reference to Morrissette, (Doc. 17-1 at 1), and Plaintiff does not allege that any *Defendant* was aware of his claim on June 8.

On June 11, 2018, prior to being served with the Conduct Report, Plaintiff was en route pursuant to his previously-approved transfer. Upon learning of the pending charge, Unit Manager Defendant Snively directed Plaintiff's return to LeCI that same day. (Snively Aff. at ¶ 8; Doc. 18, Ford Aff. at ¶9). A finding of guilt would result in the cancellation of the transfer. (Schweitzer Aff. at ¶¶ 8-9, Snively Aff. at ¶9, Ford Aff at ¶9).

On June 12, 2018, Defendant Dupuis served a copy of the Conduct Report on Plaintiff. (Doc. 17-1 at 2-3; Dupuis Aff. at ¶9). Plaintiff entered a plea of "not guilty" and made the following statement: "Not guilty. I took out for it cause I was afraid of the other guy it belonged to. He is affiliated." (*Id.* at 3; Dupuis Aff. at ¶9). Plaintiff's formal response to the Conduct Report after his return to LeCI marks the first date in which Plaintiff conveyed any fear of Morrissette to any Defendant. However, his "fear" was expressed only as a basis for recanting his prior admission to guilt on the Conduct Charge.

4

On June 15, 2018, Plaintiff appeared for a hearing before the Rules Infraction Board ("RIB"), on which Dupuis sat. Plaintiff presented his defense that he "took out for fear of retaliation," but nevertheless was found guilty. (Doc. 17-1 at 4-7). The RIB finding was based upon the facts stated in Braxton's Conduct Report, including drugs discovered under Plaintiff's mattress, Plaintiff's contemporaneous confession, and the evidence collected by Lt. Flowers including laboratory results identifying the drugs.

The RIB form contains multiple check-box style questions and responses. In one apparent inconsistency, "yes" instead of "no" is checked in response to the query: "Did the Board believe the inmate's defense?" However, the narrative response to the follow-up question "Why?" states: "RIB believes the DCR [Disciplinary Conduct Report] to be factual and substantiates the rule violation 39." (*Id.* at 7). The facts stated in the Conduct Report do not reference Morrissette and contradict Plaintiff's RIB defense.[3]

As a result of the Rule 39 violation, Plaintiff was sentenced to limited privilege housing until June 22, with 30 days visitation restrictions and a corresponding loss of good time. His prison transfer was canceled. Plaintiff's appeals of the Rule 39 conviction were denied on June 28 and 30, 2018. (Doc. 17-1 at 10-11).

Plaintiff's complaint alleges that he communicated to Defendant Cooper that he did not want to return to the same cell after the conclusion of his limited privilege housing confinement, but that Cooper "ignored" him. In contrast to that allegation, Defendant Cooper has submitted unrebutted affidavit testimony that "[a]t no point whatsoever did Price ever voice to me any problems, issues, or concerns, regarding his J-Block cellmate

---

[3]Plaintiff insists that the "yes" mark accurately reflects the RIB's acceptance of his hearing testimony, while Defendants suggest that the mark reflects a typographical error. A challenge to the disciplinary conviction itself is not a cognizable claim in this lawsuit. *See Heck v. Humphrey*, 512 U.S. 477 (1994); *Edwards v. Balisok*, 520 U.S. 641 (1997).

('Morrissette')." (Doc. 17-15, Cooper Aff. at ¶¶ 8-9). Plaintiff also alleges that while being transported by a non-party correctional officer on June 22, he told that officer that he did not want to enter the cell but the officer told him to go in anyway. Shortly after entering the cell on June 22, 2018, Plaintiff alleges that he was "attacked with a knife type object" by Morrissette, suffered "two black eyes[,] cuts to his back and face[,] slices to his neck shoulder area, stomach and was left on the floor to die." (Doc. 3 at PageID 47).

There were no witnesses to the altercation, but multiple records confirm that an altercation occurred. In contrast to Plaintiff's allegations, no weapon was recovered and unrefuted contemporaneous medical records reflect that Plaintiff suffered only minor wounds. A Conduct Report issued at the time by non-party C/O Paul also contradicts the allegations of the complaint. Although Plaintiff alleges that he was "left on the floor to die," (*id.* at PageID 47), the Conduct Report states that Plaintiff approached C/O Paul at 12:50 p.m. to report that "he was in a fight with his Cellmate Morrissette." (Doc. 17-2 at 1). Paul "sent Inmate Price to speak with unit manager Snively. He was then placed into handcuffs by a relief officer and escorted to the infirmary." (*Id.*)

A contemporaneous Medical Exam report reflects Plaintiff's statement: "I am trying to get a bed move" but contains no mention of a "stabbing" or "assault" or reference to any weapon. (Doc. 17-2 at 21). Medical findings reflect only superficial wounds: "abrasions on left lateral neck, cut that encompasses back half of neck, left abdomen has abrasion, contusion above bridge of nose, abrasion right neck." (Doc. 17-2 at 21). In multiple records, Plaintiff refers to the altercation as a "fight." For example, Plaintiff later complained of chest pain that he attributed to "stress" and open wounds that he attributed to "the fight I had earlier." (Doc. 17-9 at 7). Staff noted a normal heart rhythm and found

"no open wounds" and "no bleeding at this time." (*Id.*) Additional medical records reflect that after reporting to medical for treatment after a "fight," the examining nurse cleaned the cut and abrasions, applied antibiotic ointment, and gave Plaintiff a tetanus shot prior to releasing him to segregation. No stitches were required. (*See* Doc. 17-9 at 5-6; Doc. 17-2. at 21). On June 26, 2018, Plaintiff was examined at a follow-up appointment, at which he presented with "additional complaints of nose injury and missing tooth" from the same altercation. (Doc. 17-9 at 15). The examining nurse noted "facial bruising" and "scratches to neck" which were noted to be "healing without s/s of infection." (Doc. 17-9 at 15).

Both Plaintiff and Morrissette were charged with the same Rule 19 Violation (fighting) based on the incident. (Doc. 17-2. at 2; Doc. 17- at 2). Plaintiff pleaded not guilty, making the following statement: "I was assaulted. He stabbed me and has been extorting me." (Doc. 17-2 at 8). Plaintiff asserted: "I walked in the room started using the restroom and the inmate hit me from behind with an object, …he started cutting me around my neck and stomach area. He must have had a weapon of some kind because I have the marks and bruises to prove it." (Doc. 17-2 at 14). In contrast to Plaintiff's account, however, Morrissette claimed that the fight was a result of him refusing to take responsibility for the drugs and Plaintiff becoming angry as a result. (Doc. 17-6 at 3-4). Investigators found that both inmates' injuries were "consistent with fighting marks and scratches caused by their cell bunks" and noted that no weapon was ever found. (Ford Aff. at ¶ 14).

At a hearing on June 28, the RIB found Plaintiff guilty of fighting, citing the facts contained in the Conduct Report and the medical examination report. The RIB checked

7

the box indicating that they considered but did not believe Plaintiff's defense and instead "believe[d] the DRC…to be factual." (Doc. 17-2 at 11; Dupuis Aff. at ¶14). Plaintiff's appeal was denied and the conviction was affirmed. (Doc. 17-2 at 19).

Plaintiff was again confined to restricted housing beginning on June 22. Upon his scheduled release from segregation, he was assigned to be housed in a different cell than Morrissette. However, he refused to return to J-Block based upon his asserted fear of Morrissette's "gang" associates. (Doc. 17-15, Cooper Aff. at ¶11). Therefore, Plaintiff initially remained housed in C-Block. He remained housed apart from Morrissette for several months until he was transferred to a different penal institution, WCI. (*Id.*) During the months prior to his transfer, Plaintiff formally requested protective control (protective housing) but his requests were denied.

Investigators who reviewed Plaintiff's protective control requests believed that there was no credible evidence to support Price's allegations that Morrissette was threatening and/or extorting him.[4] Rather, having interviewed both Price and Morrissette, the Protective Control Committee determined that Price was trying to pin the Rule 39 drug violation on Morrissette "in the hopes of reinstating his prison transfer." (Doc. 17-11 at ¶¶ 9-11; Doc. 18, Ford Aff. at ¶13). Ford attested that unlike Plaintiff,[5] Morrissette had no previous drug infractions, a factor that "was considered only to the extent it weighed on

---

[4]In support of summary judgment, Defendants have submitted evidence that Morrissette is not listed in any Security Threat Group profile that would reflect gang association. In opposition to summary judgment, Plaintiff argues that the fact that Morrissette's name is not listed does not prove he is not affiliated. (Doc. 23 at 6). However, whether Morrissette was or was not affiliated with any gangs is not material; what is relevant is Defendants' assessment of whether a credible threat existed.

[5]Plaintiff's disciplinary record reflects several convictions for drug-related offenses during his incarceration. (Doc. 17-5 at 7-8).

8

Price's credibility and not as a conclusive indicator of guilt." (Ford Aff. at ¶ 14). Likewise, Defendant Dupuis has attested that the Protective Control Committee

> determined that Price's Rule 39 drug violation had cancelled his visitation transfer. However, in an effort to reinstate his transfer, Price attempted to have Morrissette claim ownership of the drugs, and when Morrissette refused, a fight broke out between the inmates. The committee further found there was no credible threat to Price's health or safety, that protective control was not warranted, and that Price was trying to manipulate the system for a visitation transfer. Thereafter, on July 9, 2018, Warden Schweitzer approved the committee's recommendation of no protective control…and ordered Price to return to general population.

(Doc. 17-12, Dupuis Aff. at ¶ 16). From June 28 through his ultimate transfer to WCI, Plaintiff continued to attempt to protest his disciplinary convictions and to reinstate his transfer to Mansfield. He filed 42 grievances relating his concerns over the disciplinary convictions and denial of his protective control request.

### III. Analysis of Plaintiff's Eighth Amendment "Failure-to-Protect" Claims

In the context of the pending motion, Plaintiff's complaint is liberally construed to assert two distinct failure-to-protect claims against the four Defendants: (1) a claim based upon the Defendants' alleged failure to protect Plaintiff from being attacked by his cellmate on June 22; (2) a claim based upon the denial of Plaintiff's requests for protective control after the altercation with Morrissette. The seminal case setting forth the standards for Plaintiff's claims is *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). In *Farmer*, the Supreme Court held that the Eighth Amendment imposes on prison officials a duty to take "reasonable measures to guarantee the safety of the inmates," *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970 (1994), which includes "protect[ing] prisoners from violence at the hands of other prisoners." *Id.* at 833, 114 S.Ct. 1970 (internal citation omitted); *see also Curry v. Scott*, 249 F.3d 493, 506 (6th Cir. 2001). A prisoner can show a violation of

9

the Eighth Amendment if he proves both an objective and subjective component of a "failure to protect" claim.

Under the objective component of the claim, the plaintiff first must show that he was "incarcerated under conditions posing a substantial risk of serious harm." *Id.*, 511 U.S. at 834. Second, under the subjective component, the court examines the defendant's state of mind to determine whether he acted with "deliberate indifference" equivalent to an intent to punish inmate health or safety. *Id.; see also Molton v. City of Cleveland*, 839 F.2d 240, 243 (6th Cir. 1988). To establish the subjective component, a plaintiff must show that the defendant official knew of and disregarded an excessive risk to inmate health or safety; the official must be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must draw the inference. *Farmer*, 511 U.S. at 837. Therefore, a prison official can be liable if he disregards that risk by failing to take reasonable measures to abate it. *Id.* at 847.

Defendants persuasively argue that they are entitled to summary judgment. On the record presented, Plaintiff cannot show either the objective or the subjective components of any claim either prior to the June 22, 2018 altercation with Morrissette, or after that date.

### A. Objective and Subjective Components Before June 22

Plaintiff alleges that he confessed to ownership of the contraband on June 8 based upon a reported "fear" of Morrissette if he did not confess at that time. However, Plaintiff was separated from Morrissette for the 14-day period between the seizure of drugs on June 8 and June 22, due to disciplinary proceedings and his corresponding sentence. Neither in his complaint nor in opposition to summary judgment does Plaintiff allege any

specific threat by Morrissette *after* Plaintiff admitted to ownership of the drugs on June 8 but *before* Plaintiff was returned to the cell on June 22.

According to Plaintiff's own account, the "threat" was a conditional one requiring Plaintiff to confess or to face retribution by the alleged true owner, Morrissette, if he did not. Plaintiff alleges that he complied with the threat and confessed on June 8.[6] At the disciplinary hearing, Plaintiff attempted to retract that confession based upon his professed fear of Morrissette if he had not confessed. However, the RIB panel rejected Plaintiff's retraction and convicted Plaintiff.

Plaintiff does not allege that he had any additional contact with Morrissette during his two-week confinement to restricted housing, nor does he allege that Morrissette conveyed any *new* threat after Plaintiff confessed and was convicted of the drug charge. While not articulating any specific new threat, Plaintiff more generally alleges in his complaint that he asked Defendant Cooper not to return him to Morrissette's cell. However, Defendant Cooper has offered unrebutted testimony that Plaintiff did not tell him prior to June 22 (or after) that Plaintiff had concerns about returning to his previous cell. In his response in opposition to summary judgment, Plaintiff suggests - for the first time - that the reason he did not speak out prior to being returned to the same cell with Morrissette is because "[i]f an inmate refuses an order from LeCI staff 'they get beat up.'"

---

[6]Plaintiff has made inconsistent statements about whether Morrissette only implicitly or explicitly threatened him on June 8. For example, in a written appeal of his disciplinary conviction dated June 17, 2018, Plaintiff states that after Morrissette denied ownership, Plaintiff admitted to the drugs based upon an implicit threat. (See Doc. 17-1 at 16, "I'm thinking, if he's not gonna take out, then I better, cause I know he's in like 2 gangs, so I truly didn't want problems, so I took out soon as my celly left, I told that Lt. and c/o they really aren't mine."; *see also* Doc. 17- at 18, grievance stating that after Morrissette denied that the drugs were his, "that told me what he was *expecting me to do* out of fear of his gang members, I did it, plus I thought since I'm leaving anyway, e.t.c." (emphasis added)). However, in his federal complaint, Plaintiff alleges that Morrissette's threat was explicit. (*See* Doc. 3 at PageID 45, alleging that Morrissette expressly told him "take out for anything they find or get fucked up.").

11

(Doc. 23 at 4).[7] However, Plaintiff's response fails to demonstrate any factual or legal dispute concerning whether Plaintiff alerted the Defendants to an objectively serious threat.[8] Plaintiff's failure to convey any specific threat beyond the June 8 "if-you-don't-confess" conditional threat (asserted in defense to disciplinary proceedings) is insufficient to demonstrate the objective component of a claim prior to June 22.

"When an inmate fails to allege that he received specific threats and that he communicated those specific threats or fears to prison personnel, the Complaint fails to state an Eighth Amendment claim for failure to protect." *Mosquera v. Delgado*, 2010 WL 2010973 at *4 (additional citations omitted) (inmate who alleged that he repeatedly told defendants that he feared for his health and safety due to "serious threats and conflict" with gang members did not show objective conditions posing a substantial risk because inmate identified only general conflict and failed to ask prison personnel for protection after notifying them of threat). In order to prove the objective element of his claim, Plaintiff must do more than allege a generalized concern for his safety and welfare. Because the record does not reflect that Plaintiff alerted any of the Defendants to a specific threat before June 22, beyond the conditional threat that allegedly caused him to falsely confess to the drugs, the facts alleged by Plaintiff fall short of the requisite standard.

The essence of Plaintiff's claim is that the Defendants failed to prevent the "attack" on June 22. In addition to arguing that Plaintiff has not offered proof of a sufficiently objectively serious threat, Defendants maintain that Plaintiff's allegation that he was

---

[7] Plaintiff's response also asserts that Plaintiff told an unidentified correctional officer during his transport to the cell that he did not want to be housed with Morrissette. (*Id.*) Aside from the lack of evidence to support that general assertion, it is irrelevant because Plaintiff does not allege that he alerted any Defendant of any specific and continuing threat from Morrissette.

[8] In his response, Plaintiff freely admits "I have no documents in my possession to support my claims….but do rely on …conduct reports and RIB's determination…." (Doc. 23 at 7, "Affidavit of Terrell Price").

12

"stabbed" by Morrissette "is blatantly contradicted by the record." (Doc. 17 at 12). Defendants contend that a failure-to-protect claim cannot stand when a plaintiff himself initiates a fight with another inmate. It is true that medical and disciplinary conviction records undermine Plaintiff's claim that a weapon was involved as well as his claim of any serious injury. However, there were no witnesses other than Plaintiff and Morrissette. Nothing in the record conclusively shows which inmate initiated the altercation; both were charged and convicted of fighting. Rather than who initiated the fight, the more critical fact is Plaintiff's failure to show that he communicated to Defendants any substantial threat after Plaintiff admitted to ownership of the drugs on June 8 but before he was returned to the same cell on June 22, 2018.

All four Defendants are entitled to judgment based upon Plaintiff's failure to prove that any of them were subjectively aware of but disregarded a substantial risk to Plaintiff's safety prior to June 22, 2018. A culpable state of mind requires "[o]bduracy or wantonness," not mere inadvertence. *Gibson v. Foltz*, 963 F.2d 851, 853 (6th Cir.1992*); accord Farmer v. Brennan*, 511 U.S. 825, 835, 114 S.Ct. 1970 (1994)(holding that official must know of and disregard an excessive risk to inmate health or safety); *see also Scott v. Odmark*, 107 F.3d 871, 1997 WL 76213 (6th Cir. 1997) (Table, text available in Westlaw, affirming dismissal of failure to prove claim where, despite knowledge that cellmates fought when first placed together, it was reasonable for Defendant to assume that inmates could co-habitate when they were able to sustain civility toward each other for a period of five days); *O'Connell v. Williams*, 241 Fed. Appx. 55, 58 (3rd Cir. 2007) (an inmate cannot establish subjective awareness of serious risk simply by asserting that staff were informed that inmate was not getting along with other inmates).

The RIB conviction and subsequent record provide conclusive evidence that none of the institutional authorities, including but not limited to the identified Defendants, believed there was a credible continuing threat. Instead, the RIB conviction and rejection of Plaintiff's appeal show that LeCI authorities subjectively believed Plaintiff was attempting to evade discipline after realizing it would result in the cancellation of his prison transfer. Thus, prior to June 22, there is nothing in the record to suggest that any Defendant was actually aware of and deliberately disregarded any serious threat to Plaintiff's safety. The fact that Plaintiff was injured during an altercation with Morrissette on June 22 does not change the record before that date.

### 2. Objective and Subjective Components After June 22

Plaintiff was separated from Morrissette on June 22 as a result of the altercation and was again confined to disciplinary housing. As a result of the altercation, Plaintiff was assigned a different roommate, albeit in the same housing block. When later scheduled for release from his restricted housing, and upon learning he was to return to the same housing block (J-Block) where Morrissette resided, Plaintiff refused.

Plaintiff alleges that although he was never again physically attacked, unidentified gang-related associates of Morrissette continued to verbally threaten him with physical harm if Plaintiff did not pay Morrissette for the drugs and a pair of glasses that had been confiscated on June 8. Plaintiff communicated this alleged new threat during disciplinary proceedings on the fighting conviction, as well as in multiple grievances filed after disciplinary proceedings had concluded. Plaintiff also submitted a request for protective control on June 28, 2018. (Dupuis Aff. at ¶ 15, Schweitzer Aff. at ¶ 10).

Defendant Dupuis completed an Interview Assessment that detailed Plaintiff's stated reasons for requesting protective control. (*Id.*; *see also* Doc. 17-5 at 9-12). On July 5, 2018, after interviewing both Plaintiff and Morrissette and reviewing relevant documentation, the Protective Control Committee recommended denying Plaintiff's request. (Doc. 17-5 at 2; Schweitzer Aff. at ¶11, Snively Aff. at ¶¶ 12-13; Ford Aff. at ¶¶12-13). Defendants' disbelief of Plaintiff's allegations does not constitute deliberate indifference on the record presented. "Prison officials charged with deliberate indifference might show… that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger, or that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." *Farmer*, 511 U.S. at 844; *see also Knight v. Gill*, 999 F.2d 1020, 1022 (6th Cir. 1993) (stating that defendants need only "take reasonable steps to protect inmates from violence at the hands of other inmates.").

Here, the Committee reasoned that Plaintiff was attempting to have Morrissette take ownership of the drugs in order to manipulate the system and reinstate his prison transfer. (Doc. 17-5 at 2, Schweitzer Aff. at ¶11, Snively Aff. at ¶13; Ford Aff. at ¶13). The Committee believed that the fight broke out on June 22 after Morrissette refused Plaintiff's request. (*Id.*; Dupuis Aff. at ¶ 16; Snively Aff. at ¶13; Ford Aff. at ¶13). The Committee's recommended findings were reviewed by Warden Schweitzer, who approved the denial of protective control. Even though Plaintiff alleges that he remained fearful based upon verbal threats from unidentified inmates on unspecified dates, Plaintiff remained separated from Morrissette and was not involved in any additional altercations after June 22. After exhausting his appeals and being denied protective control even

after review by Warden Schweitzer, Plaintiff submitted 42 grievances in protest, all of which were rejected or denied.

In August 2018, Defendant Warden Schweitzer was reassigned to Madison Correctional Institution and Warden Harris took over at LeCI. (Harris Aff. at ¶ 8). On September 19, 2018, Warden Harris ordered an additional Protective Control Assessment notwithstanding the prior denial. (*Id.* at ¶ 9). After completing a second investigation, the Protective Control Committee again found no facts to support a credible threat to justify placement in protective control. (Doc. 17-6 at 3-4). The Committee recommended that Plaintiff be released to limited privilege housing on the north side of LeCI in order to limit his interaction with Morrissette. (*Id.* at 4). However, as a secondary precaution and in lieu of protective control, Harris transferred Plaintiff to WCI. (Doc. 17-4; *see also* Harris Aff. at ¶ 11).

To the extent that Plaintiff seeks to hold Defendants liable for a failure to protect Plaintiff after June 22, the Defendants also are entitled to summary judgment. Although Plaintiff alleges that unidentified inmates verbally threatened him sometime after June 22, he offers no evidence to support the objective element of his claim. The record also undermines the existence of any serious threat because Plaintiff remained separated from Morrissette at all times and alleges only verbal threats (without providing any details such as dates or by whom the threats were made) after June 22.

Plaintiff also fails to show the subjective element of any claim after June 22. To prove the subjective element, Plaintiff must show that each of the Defendants were aware of a substantial risk, and actually disregarded it. "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they

responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844. In response to Plaintiff's expressed concerns, the Protective Control Committee conducted two separate investigations. Neither of those investigations found any credible threat. In addition, as a practical matter Plaintiff remained separated from Morrissette and suffered no harm after June 22, suggesting a lack of recklessness or deliberate intent to ignore any legitimate threat to Plaintiff's safety. Ultimately, a new warden transferred Plaintiff to a different institution.

### B. Qualified Immunity

Last, as government officials engaged in performing discretionary functions, all four Defendants are entitled to qualified immunity because their conduct did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). For the reasons discussed, the evidence falls short of showing either the objective and subjective components of an Eighth Amendment claim of deliberate indifference to health or safety.

### III. Conclusion and Recommendation

Accordingly, **IT IS RECOMMENDED THAT** Defendants' motion for summary judgment (Doc. 17) should be **GRANTED**, and this case should be dismissed and closed.

                                            */s Stephanie K. Bowman*
                                            Stephanie K. Bowman
                                            United States Magistrate Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

TERRELL PRICE,

    Plaintiff,

v.

OHIO DEPT. OF REHABILITATION
AND CORRECTIONS, et. al.,

    Defendants.

Case No. 1:19-cv-740

Cole, J.
Bowman, M.J.

**NOTICE**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report and Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).